Walter Wilson Flora v. Commissioner.
Flora v. Commissioner
Docket No. 2511-62.
United States Tax Court
T.C. Memo 1965-64; 1965 Tax Ct. Memo LEXIS 266; 24 T.C.M. (CCH) 333; T.C.M. (RIA) 65064; March 25, 1965
*266 Held: Net operating loss carryover deduction for 1958 denied. Petitioner failed to prove the actual occurrence of net operating losses in the prior years from which the carryovers were derived; he also failed to show that such losses, if any, were not entirely absorbed by carrybacks and carryforwards to other years prior to 1958. Walter Wilson Flora, pro se, 765 Gilpin St., Denver, Colo. Merrill R. Talpers, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The Commissioner determined a deficiency in petitioner's income tax for the year 1958 in the amount of $2,351.96 and an addition *267 to the tax for negligence pursuant to section 6653(a) of the Internal Revenue Code of 1954, in the amount of $117.60. The sole issue for decision is whether petitioner is entitled to a net operating loss deduction in the amount of $135,356.06, representing carryover losses of $134,956.27 from 1954 and $399.79 from 1956. Findings of Fact Petitioner filed his individual income tax return for each of the years 1954 through 1958 with the district director of internal revenue, Denver, Colorado. Throughout the period from 1950 through 1958, petitioner was an equal partner with his wife in a partnership engaged in business under the name Flora Engineering Company (hereinafter sometimes referred to as "the partnership"). Flora Engineering Company filed its 1954, 1955, 1956, and 1957 partnership income tax returns with the district director at Denver. A search was made of its filed by the Internal Revenue Service for the 1954 returns of both petitioner and the partnership but neither was found. Pursuant to congressional resolution and in accordance with normal operating procedures, the individual and partnership returns filed for the taxable year 1954 with the district *268 director, Denver, Colorado, would have been destroyed during the month of July, 1961, by the General Services Administration. The parties have stipulated certain facts which are found accordingly. During the latter part of 1950 the Flora Engineering Company entered a joint venture with a construction corporation for the purpose of bidding on a United States Bureau of Reclamation contract for the construction and completion of the Huron-Armour and Gavins Point-Sioux Falls, 115-KV transmission line under Schedules Nos. 2 and 4 of specification DC 3243. During the early part of 1951 this contract was awarded to the joint venture. The joint venture also bid and was awarded a Bureau of Reclaimation contract dated July 23, 1951, and described as the Boysen Dam Power Plant and Switchyard. On December 3, 1951, as a result of a disagreement between the coventurers, the Flora Engineering Company took over the 115-KV transmission line project for completion with its own resources, while the construction corporation likewise took over in its entirety the Boysen Dam project. After this separation each of the coventurers was to complete its assigned project independently of the other and stand *269 its own profit or loss on its project. Both projects, however, were to be completed under the name and responsibility of the joint venture as far as the Bureau of Reclamation was concerned. As of the same date, petitioner and his wife, copartners in Flora Engineering Company, entered into the following agreement between themselves: AGREEMENT WHEREAS, Flora Engineering Company proposes to enter into an agreement with the Flora Construction Corporation with reference to the dissolution of their joint venture operation, and WHEREAS, the proposed agreement will be to the effect that Flora Construction Corporation will take over and complete with its own resources the job known as Boysen Dam Power Plant and Switch Yard, under Schedules 1 and 2 of Bureau of Reclamation specification DC-3430, and that the Flora Engineering Company will take over and complete with its own resources Bureau of Reclamation project DC-3243, Huron Armour and Gavins Point-Sioux Falls 115-KV transmission lines, and WHEREAS, the partners of the Flora Engineering Company (Walter W. Flora and Mildred L. Flora) do somewhat disagree on this procedure, and WHEREAS, Walter W. Flora agrees that he will personally *270 indemnify Flora Engineering Company for any and all losses that may accrue from the proposed agreement to be executed, and WHEREAS, as consideration for taking this additional exposure, he is to individually receive 10% of the net profits from this operation, and WHEREAS, it is fully agreed that both parties will prosecute and execute this contract to its completion to the very best of their abilities, NOW, THEREFORE, witness our hands and seals this 3rd day of December, 1951, at Denver, Colorado. /s/ Walter W. Flora, WALTER W. FLORA /s/ Mildred L. Flora, MILDRED L. FLORA Annual receipts and expenses of the partnership for the transmission line project, which it took over on its own, were as follows: 1951
1952
1953
1954
Payments from Bureau of Reclamation
$101,228.78
$ 870,317.85
$392,001.75
$7,736.00
Expenses incurred during year
144,562.22
1,221,526.62
105,751.45
275.36
Net profit (loss) on cash basis
($ 43,333.44)
($ 351,208.77)
$286,250.30
$7,460.64
The net loss to the partnership from the entire project was $100,831.27 over the 4-year period. Since no books, records or tax returns of the partnership were available to us *271 for years prior to 1955, and no evidence was introduced before us, we are unable to determine (with one possible exception) [1] the annual profit or loss from the project as realized or reported by the partnership. Although a relatively small final payment was made by the Bureau of Reclamation in 1954, the transmission line project taken over by Flora Engineering Company was substantially completed in 1953. On September 16, 1953, the Flora Engineering Company executed a release of liability to the Bureau of Reclamation on the contract for this project. During the *272 year 1954 the financial position of petitioner and his wife and the partnership was investigated by agents of respondent in connection with an offer by petitioner to compromise his Federal tax liability for prior years. Pursuant to the investigation petitioner submitted to the investigating agent a balance sheet of the partnership dated October 25, 1954. A balance sheet of the partnership as of the beginning of 1955 (or the end of 1954) appears in the partnership's 1955 United States Partnership Return of Income. These two balance sheets are summarized in pertinent part as follows: As of
Assets
Oct. 25, 1954
Dec. 31, 1954
Cash
$ 82.36
$ 836.12
Notes and Accounts
Receivable
12,094.21
440.00
Reserve for Bad Debts
16,858.80
Investments
4,196.50
84,196.50
Fixed Assets (Equip-
ment)
10,110.50
3,035.92
Prepaid Deposits
440.00
$26,923.57
$105,367.34
Liabilities and Capital
Accounts and Notes
Payable
$97,321.14
$ 84,450.65
Walter W. Flora, Cap-
ital (Deficit)
( 33,833.23)
( 38,780.67)
Mildred L. Flora, Cap-
ital (Deficit)
( 36,564.34)
59,697.36
$26,923.57
$105,367.34
The petitioner was not on an accrual basis of accounting *273 with respect to expenses or deductions; he claimed deductions on his individual Federal income tax returns in the year when they were paid rather than in the year they were incurred. Petitioner's wife and partner did the accounting work and prepared the tax returns for the partnership and for the partners individually. In a "Statement of Loss Carry Forward - Carry Back" attached to petitioner's 1955 individual income tax return (in which the 1955 operating profit is shown to be absorbed by the net operating loss carried forward from prior years) a net operating loss for 1954 of $141,332.05 is shown. In a schedule of carry forward losses attached to his 1956 return, petitioner showed an operating loss from 1953 of $2,430.89, an operating loss from 1954 of $141,332.05, and an "operating loss forward" of $143,762.94. To this he added "Plus 1956 $1,399.79" and then stated "Forward 1-1-57 Operating Loss $145,162.73." On the fact of the return petitioner reported a loss of $1,399.79, but only $399.79 of this amount was loss from the partnership operations; $1,000 was loss from capital transactions. In the statement of "Carry Forward Losses" attached to his 1957 return, petitioner showed *274 the following: Operating Loss
1953
$ 2,430.89
1954
141,332.05
1956
1,399.79
Less:
1958 [1]
8,806.67
Forward 1-1-58
1954
$134,956.27
1956
1,399.79
$136,356.06 Elsewhere in his return he reported a loss from sales or exchanges of capital assets of $1,000, income from partnership (Flora Engineering Company) of $9,806.67, and total income on page 3 as $8,806.67. On his 1958 Federal income tax return petitioner reported profit from business from Schedule C of $11,852.81, and adjusted gross income as a loss forward of $124,503.25. In a "Carry Forward Statement" attached to the return he showed the following explanatory items: 1954
1956
Operating Loss Carry Forward
$134,956.27
$1,399.79
Less: 1958
11,852.81
Forward
123,103.46
1,399.79
$124,503.25 The Commissioner disallowed the operating loss carryover deductions claimed for 1958. In a similar schedule attached to the individual return of petitioner's wife for 1955 a net operating gain of $7,021.80 in 1954 is shown. It is conceded in petitioner's *275 brief that this gain represented her 50 percent share of partnership operations for that year and that petitioner realized operating profit that year in the same amount from the partnership. Partnership operations in 1954 were not related exclusively to the transmission line project, which had been substantially completed in 1953. During each of the years 1952, 1953, and 1954 petitioner engaged in the purchase and sale of commodities and commodity futures. He held membership certificates in the Chicago Board of Trade and the New Orleans Cotton Exchange. Some of his commodity transactions may have been conducted by petitioner in the name of the partnership, but petitioner's wife and partner exercised no control over these partnership transactions either for her own account or as representative of the partnership. The commodities purchased and sold by petitioner were never needed by him for any business in which he engaged either individually or in any other form; no salesmen or customer's men were employed in the handling of commodity transactions. Petitioner, in each of the years here pertinent during which he engaged in commodity transactions, did so as an investor or as a speculator *276 and not as a dealer in commodities and/or commodity futures. Opinion On his Federal income tax return, filed for the taxable year 1958, the petitioner claimed the benefit of a net operating loss carryover deduction pursuant to section 172 of the 1954 Code. This deduction was in an amount sufficient to exhaust all taxable income reflected in the return, and the only tax liability reported was self-employment tax in the amount of $141.75. The claimed carryover to the year 1958 apparently arose in connection with an alleged net operating loss incurred for the taxable year 1954 in the amount of $141,332.05 (of which $134,956.27 was carried forward to 1958) and a net operating loss incident to the taxable year 1956 in the amount of $1,399.79. This latter sum was composed of a $1,000 capital loss and $399.79 of alleged loss emanating from the Flora Engineering Company. The respondent in the notice of deficiency disallowed all of the claimed loss carryover deduction for the year 1958, except the $1,000 of capital loss carryover arising from the year 1956. The deduction for a net operating loss *277 carryover is a deduction "which one obtains not as of right, but as of grace," United States v. Olympic Radio and Television, Inc., 349 U.S. 232, 235 (1955), and petitioner bears the burden of proving that he is entitled to the deduction. United States v. Olympic Radio and Television, Inc., supra; A. Raymond Jones, 25 T.C. 1100 (1956), modified on other grounds, 259 F. 2d 300 (C.A. 5, 1958) and cases cited therein. The nature of the losses which petitioner seeks to carry over as a deduction is not entirely clear. This results in part from his alleged inability to locate the retained copies of the 1954 and prior years' individual and partnership income tax returns. The respondent also, after a search of its files, has been unable to locate the original partnership and individual returns and in all probability the returns were destroyed pursuant to regularly established Government procedures and regulations. The petitioner also has been unable to produce at the trial his books and records, if any, or the books and records of the partnership for the relevant periods. The reasons adduced by petitioner for his failure to produce *278 either tax returns or books for the key year 1954 (in which he alleges a net operating loss in excess of $141,000) are rather uncertain. The petition, filed on July 2, 1962, alleges that all of his (and the partnership's) tax records for the years 1948 to 1955, inclusive, were turned over to an attorney who had been handling for him a prolonged tax litigation involving earlier years, and that these records (despite the attorney's contrary contention) were never returned. However, at trial and in his brief, petitioner alleges that the books and records and tax returns were destroyed in a fire which occurred on April 2, 1957. Petitioner's wife, who did all the bookkeeping for the partnership and who prepared the partnership and individual income tax returns, testified that "there are several possibilities" as to what became of the missing records. She mentioned both the attorney in the prior litigation and the fire, but she admitted that it is not known exactly what records were burned in the fire. Furthermore, it is to be noted that while the petition alleges that "all records from 1948 to 1955, inclusive, on all tax matters cannot be found," petitioner, nonetheless, introduced into *279 evidence in this proceeding the revenue agent's report concerning the latter's examination of the years 1950, 1951, and 1952, as well as a letter from the district director indicating that the returns for the years 1951 and 1952 would be accepted as filed. Despite the handicap under which petitioner labors without records for 1954, he has nonetheless attempted to prove the 1954 net operating loss by oral testimony and certain collateral documentary evidence, particularly tax returns for years subsequent to 1954 and reports and workpapers of Government officials concerning the 1954 offer in compromise and the Bureau of Reclamation project. Strangely enough petitioner's contention as to how the alleged net operating loss for 1954 arose appears to have undergone a metamorphosis subsequent to trial. At trial petitioner contended that at least $90,000 of the $141,332.05 loss resulted from his share of an alleged 1954 net operating loss of the partnership from the Bureau of Reclamation project - although the exact nature of his contentions were not elucidated in his opening statement, and, if anything, were confused more than clarified as the trial progressed. On the other hand, in his *280 brief he quite clearly asserts that he realized a net operating gain of $7,021.80 from the partnership in 1954 and that the net operating loss arose principally from his being called upon personally to reimburse the partnership in the amount of the total net loss from the Bureau of Reclamation project (approximately $100,000). This came about as a result of a 1951 contract between himself and the partnership in which he agreed to reimburse the partnership for any loss on the 115-KV transmission line project. The balance of the claimed loss, or approximately $40,500, allegedly resulted from personal commodity transaction losses of about $47,500, reduced by approximately $7,000 his share of partnership gain for that year. Since petitioner asserts on brief that the partnership realized a gain in 1954, of which his share was $7,021.80, we must deem abandoned any argument previously made that his alleged 1954 net operating loss resulted principally from a net operating loss of the partnership from the transmission line project that year. Even if this contention had not been abandoned, the facts as we have found them make it eminently clear that we could not possibly have accepted it. *281 For petitioner to have realized a loss in excess of $90,000 from the partnership in 1954, the partnership would have to have had a loss in that year in excess of $180,000, and such a contention is incredible in light of the evidence of record. We turn then to petitioner's contention on brief that approximately $100,000 of the alleged 1954 net operating loss resulted from his being called upon in that year to reimburse the partnership for the entire net loss on the Bureau of Reclamation project. Assuming that the indemnity obligation arose from a bona fide arm's length contract, [2] we are, nonetheless, unable to find that the indemnity was ever really paid by petitioner or that the partnership or his partner were reimbursed for the loss. The comparative balance sheets set forth in our Findings of Fact reveal an increase in total partners' capital of $91,314.26 between October 25 and December 31, 1954. Net assets are increased by the same amount. [3] This substantial change in financial position is presumably attributable to the petitioner's alleged "reimbursement" and not because of any large operating loss or withdrawals of capital which may have occurred between October 25 and *282 December 31, 1954. However, petitioner's wife, the partner who did the partnership accounting, testified that the 1954 "reimbursement" was merely a bookkeeping entry and that petitioner paid no cash. Thus, it is apparent that the alleged "reimbursement" in 1954 was nothing more than the creation of a receivable from petitioner coupled with a corresponding write-up of his wife's partnership capital account. [4] Petitioner, a cash basis taxpayer, incurred *283 no expense as a result of this mere bookkeeping transaction. Petitioner's wife also testified that at some time subsequent to the years here in question the Flora Engineering Company became her sole proprietorship. The partnership form of business ceased, she stated, "when it became obvious that Walter [petitioner] could not ever pay back the amount of money that he owed to it." Thus, it further appears that the obligation to the partnership was probably never satisfied. The facts of record certainly do not establish that petitioner reimbursed the partnership in 1954. See section 1.446-1(c)(1)(i), Income Tax Regs.; Eckert v. Burnett, 283 U.S. 140 (1931), affirming 42 F. 2d 158 (C.A. 2, 1931), affirming 17 B.T.A. 263; Helvering v. Price, 309 U.S. 409 (1940); Walter J. Bemb, 5 T.C. 1335 (1945); Frank G. Robins, 8 B.T.A. 523 (1927). Furthermore, to allow a deduction for this reimbursement even if it had actually been paid in cash, *284 would result in the net loss from the transmission line project being deducted twice, since it is clear from the record that the losses had been previously taken as such periodically as the project progressed, 50 percent each by petitioner and his wife in their individual tax returns as their distributive share of annual partnership losses in loss years prior to 1954. There is no evidence that the partnership or either partner reported any income as a result of the alleged reimbursement. At the very least, petitioner would have been required to report 50 percent of the reimbursement as his share of the income which the partnership (which had previously deducted the full amount of the loss) would have realized as a result of the reimbursement. We think that our Findings of Fact and the foregoing discussion indicate the aura of unreality and the Alice in Wonderland atmosphere which envelop petitioner's contentions concerning both the Bureau of Reclamation project loss and his alleged personal reimbursement therefor in 1954. Having determined that petitioner is not entitled to this claimed deduction of approximately $100,000 in 1954, we must still examine the balance of the alleged *285 1954 net operating loss. It is apparently petitioner's contention that this approximately $40,000 balance represents deductible losses from commodity transactions sustained in 1954. However, between contention and proof there is an unbriedged chasm. The only evidence petitioner has presented to establish that he was a dealer in commodities and commodity futures in 1954 is to the effect that he bought and sold commodities themselves as well as commodity futures. From this he reaches the self-serving conclusion that his losses from these transactions are therefore ordinary operating losses. From the other evidence before us, however, we have found and can only conclude that petitioner was not a dealer in the commodities market in 1954 but instead was a speculator; his losses were capital losses. Faroll v. Jarecki, 231 F. 2d 281 (C.A. 7, 1956), certiorari denied 352 U.S. 830 (1956). See also Flora v. United States, 142 F. Supp. 602 (D.C. Wyo., 1956), affd. on other grounds 246 F. 2d 929 (C.A. 10, 1957), affd. 357 U.S. 63 (1958), affd. on rehearing 362 U.S. 145 (1960); United States v. Flora, an unreported *286 case (D.C.Colo; 1961,). Since his commodity transactions were capital to nature, any resulting losses which he may have sustained therefrom in 1954 would be excluded from use as part of a net operating deduction to be carried forward to 1958. Section 172(d)(2)(A), 1954 Internal Revenue Code. Furthermore, even if petitioner had established that he was a dealer in commodities in 1954, he has failed absolutely to establish the amount of his loss from those transactions that year. We are utterly unable to determine the amount of such alleged loss. See H. B. Moore, 8 B.T.A. 749 (1927). It was indicated at trial that third-party records were available through the office of petitioner's commodity broker and although petitioner was given every apportunity to produce those records, he did not do so. We must, therefore, also sustain respondent's determination with respect to this portion of the loss carryover petitioner seeks to deduct in 1958 because of alleged operating losses suffered in 1954. Respondent has also disallowed $399.79 of alleged net operating loss carried over from 1956. The only evidence introduced which indicates the nature and the *287 amount of this claimed carryover is found in the petitioner's and the partnership's returns for 1956 and subsequent years. No contention has been made that the books and records for 1956 are missing or otherwise unavailable. Under such circumstances the income tax returns standing alone do not establish the existence of a net operating loss. A. Raymond Jones, supra; H. B. Moore, supra. Finally, we conclude that even if petitioner had established the amount of his alleged 1954 and 1956 net operating losses, he would still have to show by competent evidence here the amount of the losses available for his use as a carryover to the taxable year 1958. He has the burden of establishing before us that the 1954 and 1956 losses were not entirely absorbed by income in prior and subsequent years to which the losses must be carried before they may be carried forward to 1958. See section 1.172-4(a)(3), Income Tax Regs. This would require evidence as to the amount of the taxable income in the two years preceding the two loss years, as well as the amount of taxable income in the years between the loss years and 1958. James W. Pennock, Jr., 25 B.T.A. 1331 (1932), *288 affd. 64 F. 2d 1018 (C.A. 2, 1933). Petitioner has not produced such evidence. The tax returns for some of the necessary years are insufficient alone to establish the results recited therein or to discharge petitioner's burden here. We hold that petitioner has failed to establish a right to a net operating loss carryover deduction for 1958. In the petition herein, no error was assigned with respect to respondent's imposition of an addition to tax for negligence, no evidence was introduced at trial respecting same, nor did petitioner refer to this matter on brief. Accordingly, since no error was assigned regarding the Commissioner's determination as to the additon to tax, that determination has not been challenged; no issue respecting the same is before us, and this Court has held repeatedly that it will not consider issues which are not raised by the pleadings. Irving Segall, 30 T.C. 734 (1958); Sicanoff Vegetable Oil Corporation, 27 T.C. 1056 (1957); F. H. Philbrick, 27 T.C. 346 (1956). See also Rule 7(c)(4) (B)4, Tax Court Rules of Practice. The addition to tax of $117.60 is, therefore, sustained. Decision will be entered *289 for the respondent. Footnotes
1. Though no returns or business records are available for 1952, other documentary evidence of record indicates that both petitioner and his wife reported on their individual returns a net operating loss for 1952 in the amount of $83,526.95. This leads to the logical inference that the partnership, which in 1952 was engaged exclusively in work on the 115-KV transmission line project, reported a net loss for that year of twice that amount, or $167,053.90. This loss must have been reported on a non-cash basis since the table immediately above indicates the loss on the cash basis for 1952 would have been $351,208.77.↩
1. It is not explained why this item which is apparently 1957 absorbed income is described as 1958.↩
2. This assumption is not entirely free from doubt when one considers that the partners were husband and wife and that the contract was not notarized and no proof was offered to show that it was actually signed on the date recited therein rather than ex post facto in an effort to shift the wife's share of the project loss to petitioner after the project was completed. However, we specifically make no holding on the question of the bona fides of the contract since the issue here dealt with may be determined on several other grounds. ↩
3. The notable changes in net assets are an increase in "Investments" of exactly $80,000 and the creation of an asset (debit) account called "Reserve for Bad Debts," in the amount of $16,858.80.↩
4. The crediting of the write-up entirely to the wife's capital account rather than splitting it one-half to each partner is not explained.↩